**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| **CITIZENS FOR RESPONSIBILITY AND** ) | |
| **ETHICS IN WASHINGTON** ) | |
| 455 Massachusetts Ave., N.W. ) | |
| Washington, DC 20001, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | |
| ) | |
| **AMERICAN ACTION NETWORK** ) | |
| 1747 Pennsylvania Ave., N.W., 5th Floor, ) | |
| Washington, DC 20006, ) | |
| ) | |
| Defendant. ) | |

_____

## COMPLAINT

1.      This is an action to remedy American Action Network's ("AAN") violations of

the Federal Election Campaign Act of 1971 ("FECA"), brought pursuant to 52 U.S.C.

§ 30109(a)(8)(C).  As alleged more fully below, AAN became a political committee no later than

2010 when it devoted a majority of its activity to electing or defeating candidates in federal

elections.  Accordingly, starting no later than 2010 and continuing to the present, AAN has

qualified as a political committee under the FECA.  It therefore had the legal obligation to

register as a political committee with the Federal Election Commission ("FEC" or the

"Commission") and to periodically file reports, starting no later than 2010 and continuing to

today, disclosing its expenses and its contributors.  AAN, however, has not done so and therefore

has violated the FECA.

2.      Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") has a

legal right to the information AAN is required to disclose.  CREW is injured because AAN is

withholding from CREW information about AAN's activities and contributors to which CREW is legally entitled and which CREW needs for its organizational work. To protect those rights, CREW filed an administrative complaint with the FEC on June 7, 2012 identifying AAN's campaign activities and alleging that AAN had violated the FECA by failing to register and report as a political committee no later than 2010.

3.     Despite the clear evidence of violation, the FEC nonetheless chose not to enforce the law against AAN. Relying on erroneous interpretations of law, the FEC dismissed CREW's complaint against AAN. CREW challenged that dismissal in court and obtained not one, but two judgments declaring that the FEC's dismissal of CREW's complaint against AAN was contrary to law. *See CREW v. FEC (CREW II)*, No. 16-cv-2255 (CRC), 2018 WL 1401262 (D.D.C. Mar. 20, 2018); *CREW v. FEC (CREW I)*, 209 F. Supp. 3d 77 (D.D.C. 2016).

4.     The most recent judgment declared that a group's spending on electioneering communications—broadcast ads that clearly identify a federal candidate, air shortly before an election, and are targeted to that candidate's electorate—presumptively count towards finding that a group's major purpose was to nominate or elect federal candidates, a judicially-created qualification for political committee treatment under the FECA. *CREW II*, 2018 WL 1401262, at *7. Because the FEC had not applied this presumption to AAN's ads, the Court declared the dismissal of CREW's complaint against AAN was contrary to law.

5.     Having had its analysis rejected, the FEC was obligated to conform with the Court's judgment in *CREW II* "within 30 days." *Id.* at *14. The Court made clear a failure to conform would result in the FECA's conferring on CREW the right to bring "a civil action to remedy the violation involved in the original complaint." *Id.* (quoting 52 U.S.C. § 30109(a)(8)(C)). The FEC's thirty days expired on April 19, 2018.

6. The FEC has not conformed with the Court's judgment in *CREW II*.

7. Accordingly, CREW brings this action "to remedy the violation involved in the original complaint" CREW filed with the FEC: AAN's violation of the FECA by failing to register and report as a political committee starting no later than 2010 and continuing to today.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 52 U.S.C. § 30109(a)(8)(C) and 28 U.S.C. §§ 1331, 2201(a), 2202. This Court has personal jurisdiction over AAN, a corporation maintaining its principal place of business in Washington, D.C., pursuant to D.C. Code Ann. § 13-422 and Federal Rule of Civil Procedure 4(k). Venue lies in this district under 28 U.S.C. § 1391(b)(1), (2), (c)(2).

## PARTIES

9. Plaintiff CREW is a non-profit, non-partisan corporation organized under section 501(c)(3) of the Internal Revenue Code.

10. CREW is committed to protecting our political system against corruption and reducing the influence of money in politics. CREW seeks to ensure that campaign finance laws are properly interpreted, enforced, and implemented.

11. To advance its mission, CREW uses a combination of research, litigation, advocacy, and public education to disseminate information to the public about public officials and their actions, and the outside influences that have been brought to bear on those actions. A core part of this work is examining and exposing the special interests that have influenced our elections and elected officials and using that information to educate voters regarding the integrity of public officials, candidates for public office, the electoral process, and our system of government.

12.     Toward this end, CREW monitors the activities of those who run for federal office as well as those groups financially supporting candidates for office or advocating for or against their election.  CREW regularly reviews campaign finance reports that groups, candidates, and political parties file with the FEC disclosing their expenditures and, in some cases, their contributors.  Using the information in those reports, CREW publicizes the role of these individuals and entities in the electoral process and the extent to which they have violated federal campaign finance laws.

13.     CREW is entitled to receive all the information the FECA requires those engaged in political activities to report publicly.  In particular, CREW is entitled to receive the information that AAN is required to publicly disclose due to its status as a political committee, and CREW is harmed by AAN's failure to provide CREW the information to which CREW is legally entitled.

14.     CREW is further hindered in carrying out its core programmatic activities when those individuals and entities that attempt to influence elections and elected officials are able to keep their identities hidden.  When groups that are legally obligated to report their activities and contributors do not do so, CREW is deprived of information critical to advancing its ongoing mission of educating the public to ensure the public continues to have a vital voice in our political process and government decisions.

15.     As part of CREW's work in carrying out its central mission, CREW focuses on so-called "pay-to-play" schemes.  Toward that end, CREW looks for correlations between donations to the campaign of a member of Congress or candidate, or to spending on independent campaign activity that nonetheless benefits a candidate, and that member's subsequent congressional activities, including advocating for policies and legislation that serve the interests

of the member's donors or financial supporters. Information that an individual or entity made a large-dollar contribution to either the candidate or a political committee may be very revealing about the influences that donor has brought to bear on the member post-election. Without information about the individuals and entities funding the political activities of organizations such as AAN, and about the spending patterns of such organizations, CREW is stymied in fulfilling its central mission.

16.     AAN is a non-profit corporation organized under the laws of Delaware. It was incorporated on July 23, 2009. At all times relevant to this complaint, AAN's principal place of business has been and continues to be in Washington, D.C. Its current address is 1747 Pennsylvania Avenue, N.W., 5th floor, Washington, D.C., 20006. In or around 2009 to 2011, AAN's address was 555 13th Street, N.W., #500W, Washington, D.C., 20004.

## STATUTORY AND REGULATORY FRAMEWORK

### *Political Committees*

17.     The FECA and implementing FEC regulations impose registration, organization, and disclosure requirements on "political committees."

18.     The FECA and implementing FEC regulations define a "political committee" as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 52 U.S.C. § 30101(4)(A); 11 C.F.R. § 100.5(a).

19.     The FECA defines an "expenditure" as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(9)(A)(i).

20.     In *Buckley*, the Supreme Court carved out from the reach of the FECA's political committee provisions groups that, while they met the statutory definition of a political committee, were neither under the control of a candidate nor had the requisite "major purpose" to nominate or elect of federal candidates.  *See Buckley v. Valeo*, 424 U.S. 1, 79 (1976).

21.     An organization may have the major purpose of electing or nominating candidates if that is its organizational purpose.  FEC, Political Committee Status, Supplemental Explanation and Justification, 72 Fed. Reg. 5595, 5601, 5605 (Feb. 7, 2007) ("Supplemental E&J").  A group's organizational purpose may be demonstrated by its "fundraising solicitations, the sources of its contributions, . . . the amounts received," "public statements," and "internal documents about the organization's mission."  *Id.* at 5605.

22.     An organization's major purpose may also be demonstrated by its activities, and a group that devotes a sufficiently extensive amount of its spending to campaign activity may be subject to the FECA's political committee provisions.  *See FEC v. Mass. Citizens for Life, Inc. ("MCFL")*, 479 U.S. 238, 262 (1986).  Although neither the courts nor the FEC have provided an exact threshold for activity to be sufficiently "extensive" to show a "major purpose," an organization that spends more than half of its funds in a year on campaign activity has a qualifying major purpose.  Supplemental E&J at 5605.

23.     At least two types of activity are so election-related that sufficiently extensive spending on them would indicate a group's major purpose is to nominate or elect federal candidates: independent expenditures and, except in rare cases, electioneering communications.

24.     An independent expenditure is an expenditure made without coordinating with a candidate that expressly advocates the election or defeat of a federal candidate.  52 U.S.C. § 30101(17); 11 C.F.R § 100.16.  An express advocacy communication is any communication

that expressly asks the audience to "vote for" or "vote against" a candidate, or that uses similar terms such that "[r]easonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action." 11 C.F.R. § 100.22.

25. An electioneering communication is any broadcast communication that "refers to a clearly identified candidate for Federal office," is publicly distributed within "60 days before a general, special, or runoff election for the office sought by the candidate, or . . . 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate, . . . is targeted to the relevant electorate," and does not fall within one of the statutory exceptions. 52 U.S.C. § 30104(f)(3)(A), (B); 11 C.F.R. § 100.29(a).

26. Electioneering communications "presumptively have an election-related purpose." *CREW II*, 2018 WL 1401262, at *7 (emphasis omitted); *see also McConnell v. FEC*, 540 U.S. 93, 206 (2003) (holding that, at very least, "the vast majority of [electioneering communications] clearly ha[ve] a[n electioneering] purpose"). Only a rare and extraordinary electioneering communication, if any, would not evince this purpose: one that, while meeting the technical requirements of an electioneering communication, nevertheless ran long before the election, made no direct or indirect reference to the election, focused on a pending piece of legislation, identified only an incumbent representative, asked viewers to contact that incumbent to request a vote for or against the legislation, and made no reference to the incumbent's prior voting history or otherwise praised or criticized her. *CREW II*, 2018 WL 1401262, at *11.

27. The FECA and implementing FEC regulations require all political committees to register with the FEC within 10 days of becoming a political committee. 52 U.S.C. § 30103(a);

11 C.F.R. § 102.1.  In addition, the political committee must identify on its first report any cash on hand at the time of filing and the source(s) of such funds.  11 C.F.R. § 104.12.

28.     Further, under the FECA and implementing FEC regulations, political committees must file periodic reports with the FEC that, among other things: (1) identify all individuals contributing an aggregate of more than $200 in a year to the organization, and the amount each individual contributed; (2) identify all political committees making a contribution to the organization, and the amount each committee contributed; (3) detail all of the organization's outstanding debts and obligations; and (4) list all of the organization's expenditures, including its independent expenditures and electioneering communications.  52 U.S.C. § 30104(a)(4), (b), (f)(2); 11 C.F.R. § 104.3; *see also* 11 C.F.R. §§ 104.4, 104.8, 104.9, 104.11–.13.

29.     Beginning when it meets the statutory qualifications of a political committee, a political committee must either: (1) file a quarterly report in any year in which there is a regularly scheduled general election, file a biannual report in other years, and file both a pre- and post-election report for any election in which it makes a contribution or expenditure; or (2) file monthly reports.  52 U.S.C. § 30104(a)(4); 11 C.F.R. 104.5(c).  In either case, the political committee must continue to file reports, and must continue to disclose its expenditures made and contributions received, until it ceases to make expenditures and receive contributions and it files a termination report with the FEC.  52 U.S.C. § 30103(d)(1); 11 C.F.R. § 102.3.

### *Enforcement*

30.     Under the FECA, any person who believes there has been a violation of the FECA may file a sworn complaint with the FEC.  52 U.S.C. § 30109(a)(1).  Based on the complaint, the response from the persons alleged to have violated the Act ("respondents"), and any recommendation of the FEC's Office of General Counsel ("OGC"), the FEC may then vote on

whether there is "reason to believe" a violation of the FECA has occurred.  52 U.S.C.

§ 30109(a)(2).  If the FEC finds there is "reason to believe" a violation of the FECA has

occurred, the FEC must notify the respondents of that finding and must "make an investigation

of such alleged violation."  *Id.*

31.     After the investigation, the OGC may recommend the FEC vote on whether there

is "probable cause" to believe the FECA has been violated.  52 U.S.C. § 30109(a)(3).  The OGC

must notify the respondents of any such recommendation and provide them with a brief stating

the position of the OGC on the legal and factual issues presented, to which the respondents may

reply.  *Id.*

32.     Upon consideration of these briefs, the FEC may then determine whether there is

"probable cause" to believe a violation of the FECA has occurred.  52 U.S.C.

§ 30109(a)(4)(A)(i).  If the FEC finds probable cause to believe a violation of the FECA has

occurred, the FEC must attempt for at least 30 days, but not more than 90 days, to resolve the

matter "by informal methods of conference, conciliation and persuasion," *id.*, a process that does

not involve the complainant.

33.     If the FEC is unable to settle the matter through informal methods, it may institute

a civil action for legal and equitable relief in the appropriate United States district court.

52 U.S.C. § 30109(a)(6)(A).  In any action instituted by the FEC, a district court may grant

injunctive relief as well as impose monetary penalties.  52 U.S.C. § 30109(a)(6)(B), (C).

34.     If at any stage of the proceedings the FEC dismisses a complaint, any "party

aggrieved" may seek judicial review of that dismissal in the United States District Court for the

District of Columbia.  52 U.S.C. § 30109(a)(8)(A).

35.     The district court reviewing the FEC's dismissal of a complaint may declare the FEC's actions "contrary to law."  52 U.S.C. § 30109(a)(8)(C).  The court also may order the FEC "to conform with such declaration within 30 days."  *Id.*  If the FEC fails to abide by the court's order, the FECA provides the complainant with a private right of action, brought in the complainants' own name, "to remedy the violation involved in the original complaint."  *Id.*

## **FACTUAL BACKGROUND**

### *AAN's Campaign Activity*

36.     AAN publicly describes its mission as creating, encouraging, and promoting center-right policies based on the principles of freedom, limited government, American exceptionalism, and strong national security.  Its publicly stated "primary goal" is "to put our center-right ideas into action by engaging the hearts and minds of the American people and spurring them into active participation in our democracy."  AAN's activities, however, reveal its true mission was and is to elect and defeat candidates for federal office, a mission that is likely reflected in its non-public statements.

37.     Over the course of its first two years of existence, from 2009 to 2010, AAN devoted well more than half—likely closer to 71 percent—of its spending to campaign activities, with the number reaching around 74.2 percent in 2010 alone.  To fund those activities, AAN accepted over $1,000 contributions at the time or near the time it was founded in mid-2009, meeting the FECA's threshold for political committee status at that time.  AAN also met the FECA's $1,000 expenditure threshold in May 2010 when it ran its first independent expenditure.  Further, AAN's share of disbursements devoted to election-related spending was unquestionably extensive.

38.     AAN was founded on July 23, 2009.  Over the course of its first fiscal year, AAN

accepted approximately $2,750,000 in contributions.  In addition, the group required funds to

cover its initial operating expenses, including filing for incorporation.  AAN accepted

contributions to cover those expenses.  Further, as alleged more fully below, AAN was heavily

involved in campaign activities soon after its formation, indicating that it received contributions

prior to such activities and that any contribution AAN received was for the purpose of

nominating or electing candidates.

39.     Accordingly, on or around July 23, 2009, AAN accepted at least $1,000 in

contributions, qualifying it as a political committee under the terms of the FECA.  52 U.S.C.

§ 30101(4).

40.     Further, between May 6, 2010, and June 30, 2011, according to reports AAN filed

with the FEC, AAN spent $4,096,909 on independent expenditures and $14,038,625 on

electioneering communications, a total of $18,135,535.  Broken down by AAN's fiscal year,

AAN reported spending $4,036,987 on independent expenditures and $14,038,625 on

electioneering communications between July 1, 2010 and June 30, 2011, a total of $18,075,612.

AAN further reported spending $59,922 on independent expenditures between May 6, 2010 and

June 30, 2010.  The money was spent largely producing and broadcasting television and internet

advertisements in 29 primary and general elections.

41.     AAN's earliest independent expenditure was $29,000 the group spent on an ad

supporting Tim Burns, a Republican candidate for a special election for a House seat in

Pennsylvania, on May 6, 2010.  Accordingly, AAN met the statutory qualification for political

committee status—making over $1,000 in expenditures in one calendar year, 52 U.S.C.

§ 30101(4)—no later than May 6, 2010.

42.     AAN's other reported independent expenditures between 2010 and 2011 included: $849,909 to produce and broadcast advertisements against Bill Keating, a Democrat running for a House seat in Massachusetts; $703,404 to produce and broadcast advertisements against Bryan Lentz, a Democrat running for a House seat in Pennsylvania; $659,909 to produce and broadcast advertisements against Dan Seals, a Democrat running for a House seat in Illinois; $455,000 to produce and broadcast advertisements against Sen. Russ Feingold (D-WI); and $134,909 to produce and broadcast advertisements against Chad Causey, a Democrat running for a House seat in Arkansas.

43.     AAN's independent expenditures further included sponsoring a website related to the New Hampshire Senate race between Democrat Paul Hodes and Republican Kelly Ayotte that asked for signatures on a petition to "help send Hodes packing," and spending $514,894 on television, radio, and internet advertisements calling Hodes "unaffordable."

44.     AAN also spent significant funds on electioneering communications in twenty different federal races in 2010.

45.     For example, starting on October 22, 2010, just weeks before the election, AAN spent $725,000 broadcasting an advertisement against Rep. Ed Perlmutter (D-CO) that expressed disbelief that "convicted rapists can get Viagra paid for by the new health care bill."  Noting Rep. Perlmutter had voted for the Affordable Care Act, the advertisement encouraged viewers to "tell Congressman Perlmutter to vote for repeal in November" and to "[v]ote Yes on H.R. 4903."

46.     The House went into recess at the end of September 2010, with no votes scheduled on H.R. 4903 or any other bill repealing the health care law during November 2010 or, indeed, the remainder of the 111th Congress.  Accordingly, AAN's reference to a vote "in November"

could have referred only to the upcoming congressional election in which viewers of the advertisement could vote.

47.     AAN spent another $705,000 broadcasting a nearly identical advertisement against Rep. Dina Titus (D-NV).

48.     AAN also spent $725,000 on a different advertisement similarly encouraging viewers to call Rep. Perlmutter "in November" and tell him to vote to repeal the health care law. AAN spent another $370,000 broadcasting a nearly identical advertisement against Rep. Mark Schauer (D-MI).

49.     AAN further reported as electioneering communications millions of dollars it spent on advertisements in 2010 that did little more than call candidates "extreme" and tie them to former House Speaker Nancy Pelosi.  For example, AAN spent $875,000 on an advertisement claiming that Ann Kuster, the Democratic candidate for a New Hampshire House seat, supported massive tax hikes, and asserting that "Nancy Pelosi is not extreme. Compared to Annie Kuster." Similarly, AAN spent $225,000 on an advertisement noting that Mike Oliverio, the Democratic candidate for a West Virginia House seat, supported then-Speaker Pelosi and would do whatever she told him to.

50.     All of the electioneering communications AAN broadcast in 2010 were related to the election.  The ads not only met the statutory definition of electioneering communications, but criticized or praised the identified candidate, discussed the identified candidate's voting record, did not discuss a pending legislative matter, referred to the upcoming election, ran in the weeks before an election rather than at the beginning of the electioneering communication window, and/or referred to non-incumbent candidates.  Accordingly, all AAN's electioneering communications exhibit the purpose of nominating or electing federal candidates.

51. On its 2010 tax return, covering the fiscal year July 1, 2010 through June 30, 2011, AAN reported spending a total of $25,692,334 on all activities during that period. AAN reported to the FEC spending $18,075,612 on independent expenditures and electioneering communications during the 2010 fiscal year. As a result, AAN's spending on its independent expenditures and electioneering communications comprised no less than approximately 70.4 percent of its total spending in that fiscal year.

52. In addition to its spending on independent expenditures and electioneering communications, AAN spent other funds on elections in 2010. On its 2010 tax return, AAN reported spending a total of $5,035,953 on political expenditures. That is approximately $998,966 more than the amount it spent on independent expenditures that year as reported to the FEC. AAN maintained in previous proceedings that none of the money it spent on electioneering communications qualified as political expenditures.

53. Accordingly, between July 1, 2010 and June 30, 2011, AAN spent an additional $998,966 on federal campaign activities that were neither reported electioneering communications nor independent expenditures.

54. Adding that sum to the $18,075,612 AAN reported spending on independent expenditures and electioneering communications, AAN's total campaign spending for fiscal year 2010 was at least $19,074,578, or 74.2 percent of its total spending.

55. Shifting focus to AAN's first two years of existence, AAN spent most of its money on election-related activities. On its 2009 tax return, AAN reported spending a total of $1,446,675 on all activities for the period July 23, 2009 through June 30, 2010, its 2009 fiscal year, making AAN's total reported spending for its 2009 and 2010 fiscal years combined $27,139,009. The $18,135,535 in independent expenditures and electioneering communications

AAN reported to the FEC, therefore, comprises 66.8 percent of its total spending between July 23, 2009 and June 30, 2011.

56. As with its 2010 tax return, AAN's 2009 tax return reported more political expenditures than AAN reported to the FEC. AAN's 2009 tax return identified $185,108 in political expenses, $125,186 more than AAN reported in independent expenditures during the same period.

57. Accordingly, AAN spent $125,186 between July 23, 2009 and June 30, 2010 to elect or defeat federal candidates that did not go towards either its independent expenditures or its electioneering communications.

58. Including all of that spending for fiscal years 2009 and 2010 brings AAN's total spending on campaign activity to $19,259,686. Based on this figure, AAN's campaign spending comprised 71.0 percent of its overall spending between July 23, 2009 and June 30, 2011. These figures do not include other spending, such as overhead and staff time, that was incurred to support AAN's campaign activity.

59. In summary, AAN's spending for 2009 and 2010 are as follows:

| AAN's Reported Sums | FY 2010 | Combined FYs 2009-2010 |
|---|---|---|
| Electioneering Communications | $14,038,625 | $14,038,625 |
| Independent Expenditures | $4,036,987 | $4,096,909 |
| Total Electioneering Communications and Independent Expenditures | $18,075,612 | $18,135,534 |
| Other Campaign Activities | $998,966 | $1,124,152 |
| Total Campaign Activities | $19,074,578 | $19,259,686 |
| All Disbursements | $25,692,334 | $27,139,009 |
| Percent of Total Disbursements on Electioneering Communications and Independent Expenditures | 70.4% | 66.8% |
| Percent of Total Disbursements Directly Spent on All Campaign Activities | 74.2% | 71.0% |

60.     The fact that AAN's campaign spending in 2010 far exceeded 50 percent of its total spending demonstrates its major purpose, no later than 2010, and was and continues to be to nominate or elect federal candidates.  Accordingly, AAN is not excused from political committee reporting under *Buckley*.

61.     Further, AAN's organizational purpose has been, since its founding on July 23, 2009, and continues to be to nominate or elect federal candidates.

62.     AAN has continued to make campaign-related expenditures in each federal election cycle since 2010.

63.     AAN has continued to accept contributions in each two-year federal election cycle since 2010.

64.     Despite qualifying as a political committee no later than 2010, AAN has never registered as a political committee with the FEC.  AAN also has never filed a political committee report of any type, as required by 52 U.S.C. § 30104(a) and 11 C.F.R. § 104.5(c).  Nor has AAN ever filed a termination report with the FEC.

65.     Due to these failures, CREW is unaware of the identity of AAN's contributors and the recipients of many of its disbursements, despite the fact that federal law and applicable FEC regulations require such disclosures.

### *Exhaustion of Administrative Remedies*

66.     On June 7, 2012, CREW filed a complaint with the FEC against AAN for violating the FECA ("MUR 6589").  The complaint made the same allegations contained herein, specifically that, as demonstrated by its extensive spending on federal campaign activities, AAN qualified as a political committee no later than 2010 but that it failed to register and report as a political committee.

67.     The FEC's OGC reviewed CREW's complaint and recommended that the FEC proceed with an investigation against AAN.

68.     Despite the well-substantiated allegations in the administrative complaint and despite the recommendation of the FEC's OGC, the FEC dismissed CREW's complaint on June 24, 2014 after the Commission deadlocked three-to-three on the OGC's recommendation.

69.     CREW brought suit to challenge the dismissal pursuant to 52 U.S.C. § 30109(a)(8)(C).  On September 19, 2016, Judge Christopher Cooper granted CREW's motion for summary judgment, finding that the FEC's dismissal of CREW's complaint against AAN was "contrary to law."  *CREW I*, 209 F. Supp. 3d at 95.  In relevant part, Judge Cooper ruled that the three Commissioners who voted against the OGC's recommendation committed legal error by concluding that the "First Amendment effectively required the agency to exclude from its consideration all non-express advocacy in the context of disclosure," including the FECA's political committee provisions.  *Id.* at 93.  The Court found that it "blinks reality to conclude that many of the ads considered by the Commissioners in this case were not designed to influence the election or defeat of a particular candidate in an ongoing race."  *Id.*  Rather, the Court noted that the record supported the conclusion that, at a minimum, "*many* or even *most* electioneering communications indicate a campaign related purpose."  *Id.*  Accordingly, the Court reversed the dismissal and remanded for reconsideration by the FEC within thirty days, to be made in conformity with the Court's declaration.  *Id.* at 95.

70.     On October 19, 2016, the FEC notified CREW that the Commission had once again deadlocked on the question of whether AAN had violated 52 U.S.C. §§ 30102, 30103, 30104, and therefore that the Commission had voted to once again close its file on AAN.

71. CREW once again sought judicial review of this dismissal pursuant to 52 U.S.C. § 30109(a)(8)(C). On March 20, 2018, Judge Cooper again found that the dismissal was "contrary to law." *CREW II*, 2018 WL 1401262, at *14. Judge Cooper found that electioneering communications "presumptively have an election-related purpose." *Id.* at *7 (emphasis omitted). Only an "extraordinary" and "rare" electioneering communication would lack this purpose and thus cause the sums spent on it to count against finding the organization had the major purpose of nominating or electing candidates. *Id.* at *11. Judge Cooper found that the analysis of the three Commissioners below who voted against proceeding did not adequately reflect this presumption and thus their analysis of AAN's electioneering communications was contrary to law. Judge Cooper ordered the FEC to conform with the March 20, 2018 judgment within 30 days and noted the FEC's failure to "timely conform with the Court's declaration" would mean "CREW may bring 'a civil action to remedy the violation involved in the original complaint.'" *Id.* at *14 (quoting 52 U.S.C. § 30109(a)(8)(C)).

72. The FEC's deadline to conform with Judge Cooper's March 20, 2018 judgment was April 19, 2018.

73. The FEC failed to conform with the March 20, 2018 judgment by April 19, 2018.

## PLAINTIFF'S CLAIMS FOR RELIEF

### CLAIM ONE
### Failure to Register as a Political Committee

74. CREW re-alleges and incorporates by reference all preceding paragraphs as fully set forth herein.

75. AAN was a political committee as early as July 23, 2009 and no later than May 6, 2010, yet failed to register as one with the FEC.

76.     The FECA and implementing FEC regulations define a "political committee" as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 52 U.S.C. § 30101(4)(A); 11 C.F.R. § 100.5(a).

77.     An "independent expenditure" is, by definition, an expenditure by a person for a communication "expressly advocating the election or defeat of a clearly identified candidate." 52 U.S.C. § 30101(17).

78.     AAN made expenditures aggregating in excess of $1,000 during 2010.  On May 6, 2010, AAN reported to the FEC it spent $29,000 on independent expenditures.

79.     AAN accepted contributions in excess of $1,000 in 2009.

80.     Organizations that lack a "major purpose" of nominating or electing federal candidates and which are not under the control of candidates may not be treated as "political committees." *Buckley*, 424 U.S. at 79.  The FEC conducts a fact-intensive case-by-case analysis of an organization to determine if its major purpose is the nomination or election of federal candidates.  Supplemental E&J at 5601; *The Real Truth About Obama, Inc. v. FEC*, 796 F. Supp. 2d 736, 751 (E.D. Va. 2011).  An organization can satisfy the major purpose test through revealing its organizational purpose in solicitations, public statements, and internal documents, Supplemental E&J at 5605, or through sufficiently extensive spending on federal campaign activity, *id.* at 5601; *see also MCFL*, 479 U.S. at 262.

81.     All of AAN's spending on independent expenditures and electioneering communications were for the purpose of nominating or electing federal candidates.  AAN's independent expenditures expressly advocate the election or defeat of a candidate, 52 U.S.C. § 30101(17), and its electioneering communications are not of the rare and extraordinary sort

that lack a political purpose, *see CREW II*, 2018 WL 1401262, at *12; *CREW I*, 209 F. Supp. 3d at 83.

82.     As demonstrated by its extensive spending on federal campaign activity, AAN's major purpose in 2010 was the nomination or election of federal candidates.  AAN's spending to elect or nominate federal candidates certainly was greater than 50 percent in 2010, and likely 74.2 percent or more of its spending that year.

83.     Further, AAN's organizational purpose in 2009 was campaign activity.  Therefore, in 2009, AAN's major purpose was to nominate or elect federal candidates.

84.     FECA and implementing FEC regulations require all political committees to register with the FEC within 10 days of becoming a political committee.  52 U.S.C. § 30103(a); 11 C.F.R. § 102.1(d).

85.     AAN has never registered as a political committee with the FEC.

86.     By failing to register as a political committee, AAN violated 52 U.S.C. § 30103(a) and 11 C.F.R. § 102.1(d).

87.     By failing to register as a political committee, AAN has deprived and continues to deprive CREW of the information to which it is entitled, as that information is required to be disclosed by 52 U.S.C. § 30103(b) and 11 C.F.R. §§ 102.2, 104.12.

## CLAIM TWO
### Failure to Report

88.     CREW re-alleges and incorporates by reference all preceding paragraphs as fully set forth herein.

89.     As a political committee, AAN was required to file periodic reports with the FEC that, among other things: (1) identified all individuals who contributed an aggregate of more than $200 in a year to AAN and the amount individual each contributed; (2) identified all political

committees that made a contribution to AAN and the amount each committee contributed; (3) detailed AAN's outstanding debts and obligations; and (4) listed all of AAN's disbursements. 52 U.S.C. § 30104(a)(4), (b); 11 C.F.R. § 104.1.

90.     Beginning no later than 2010 and continuing to present, AAN has failed to file any of these reports with the FEC.

91.     By failing to file these reports, AAN violated 52 U.S.C. § 30104(a)(4), (b) and 11 C.F.R. §§ 104.1, 104.3–104.5, 104.8, 104.9, 104.11–104.13.

92.     By failing to file these reports, AAN has deprived and continues to deprive CREW of the information required to be disclosed by 52 U.S.C. § 30104(b) and 11 C.F.R. §§ 104.3, 104.8, 104.9, 104.11–104.13.

## REQUESTED RELIEF

WHEREFORE, CREW respectfully request that this Court:

(1)     Declare that AAN is a political committee under the terms of the FECA, FEC implementing regulations, and *Buckley*, 424 U.S. at 79;

(2)     Declare that AAN became a political committee on July 23, 2009 or, alternatively, no later than May 6, 2010, and that it continues to be a political committee;

(3)     Order AAN to register as a political committee with the FEC by filing the appropriate paperwork with the FEC;

(4)     Order AAN to provide CREW the information to which it is legally entitled, including the identities of all of AAN's contributors who contributed to the organization at any time whose contributions qualify them for disclosure under the FECA and applicable federal regulations;

(5)     Order AAN to file corrective disclosure reports with the FEC for each report

AAN was required to but failed to file starting on the date it qualified as a political committee

under the FECA and continuing to today, with such corrective reports providing all information

required by the FECA and applicable federal regulations on the omitted reports;

(6)     Order AAN to continue to file the required reports for political committees until

such time as AAN lawfully terminates its political committee status with the FEC;

(7)     Award CREW its costs, expenses, and reasonable attorneys' fees in this action;

and

(8)     Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Stuart McPhail*
STUART McPHAIL
(D.C. Bar No. 1032529)
smcphail@citizensforethics.org
ADAM J. RAPPAPORT
(D.C. Bar. No. 479866)
arappaport@citizensforethics.org
LAURA C. BECKERMAN
(Cal. Bar No. 278490)[*]
lbeckerman@citizensforethics.org
Citizens for Responsibility and Ethics
    in Washington
455 Massachusetts Ave. N.W.
Washington, DC 20001
Phone: (202) 408-5565
Facsimile: (202) 588-5020

April 23, 2018                    *Counsel for Citizens for Responsibility and Ethics*
                                 *in Washington*

---

[*] Application for admission to the District of Columbia pending, seeking admission *pro hac vice*.