**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,** | |
| Plaintiff, | |
| v. | Case No. 18-cv-945 (CRC) |
| **AMERICAN ACTION NETWORK,** | |
| Defendant. | |

## MEMORANDUM OPINION

"The Federal Election Commission is the only government agency that does exactly what Congress designed it to do: nothing." The punchline of that old Washington joke may be increasingly true, but its premise is uncharitable to Congress. Because when Congress mandated that the six-member Commission be split down party lines, it anticipated that partisan deadlocks were likely to result. So it legislated a fix: Under the Federal Election Campaign Act ("FECA"), if the Commission dismisses an administrative complaint alleging a campaign finance law violation by a third party, the complainant may sue the FEC in federal district court. And if the court finds that the dismissal was contrary to FECA, and the Commission fails to correct the illegality on remand, the administrative complainant can sue the alleged violator directly.

That's what happened here. In 2012, the government watchdog group Citizens for Responsibility and Ethics in Washington ("CREW") complained to the FEC that the American Action Network ("AAN"), a Washington-based political non-profit, was operating as an unregistered political committee in violation of FECA. The FEC dismissed the complaint, finding no reason to believe that a violation had occurred, and CREW sued. This Court concluded that the agency had acted contrary to FECA in dismissing the complaint and

remanded the complaint to the agency, ordering it to act within thirty days. The FEC complied but dismissed the complaint anew on different grounds, prompting CREW to sue a second time. The Court concluded that the Commission had again misapplied FECA and again remanded the matter with instructions to act. This time around, the agency failed to comply with the Court's directive. Accordingly, CREW has invoked FECA's citizen-suit provision to sue AAN directly, seeking a declaration that AAN is a political committee and an injunction ordering it to make the attendant disclosures that FECA requires. To the Court's knowledge, this is the first suit to be filed under FECA's citizen-suit provision.

AAN now moves to dismiss CREW's complaint, mounting a bevy of challenges to CREW's standing, the reviewability of the Commission's dismissals, the sufficiency of CREW's factual allegations, and the constitutionality of FECA's citizen-suit provision. For the reasons to follow, the Court will deny AAN's motion in large part.

## I. Background

### A. FECA

The Federal Election Campaign Act imposes disclosure requirements on organizations that spend money to influence federal elections. These requirements advance "three important interests: providing the electorate with relevant information about the candidates and their supporters; deterring actual corruption and discouraging the use of money for improper purposes; and facilitating enforcement of the prohibitions in the Act." McConnell v. FEC, 540 U.S. 93, 121 (2003) (controlling opinion of Stevens & O'Connor, J.J.).

Some of FECA's disclosure requirements depend on the type of communication an organization engages in. Where, for example, an entity spends over $250 in a calendar year on "independent expenditure[s]"—defined as communications "expressly advocating the election or

defeat of a clearly identified candidate," 52 U.S.C. § 30101(17)(A)—it must file a report with the Commission containing information about itself and its contributors, id. § 30104(c)(1).

FECA also mandates certain disclosures based on an entity's campaign-related spending patterns. As relevant here, "political committee[s]" are required to appoint a treasurer, keep records on their contributors, and file regular reports during a general election year disclosing, among other information, the amounts they spent on contributions and expenditures. Id. §§ 30102–04. Political committees must also register with the FEC. Id. § 30103.

An entity qualifies as a "political committee" when it satisfies two separate conditions: (1) it receives or spends more than $1,000 in a calendar year for the purpose of influencing a federal election, id. § 30101(4)(A), (8)(A)(i), (9)(A)(i); and (2) it is either "under the control of a candidate" or has "the major purpose" of "nominat[ing] or electi[ng] . . . a candidate," Buckley v. Valeo, 424 U.S. 1, 79 (1976). This second condition comes not from the text of FECA, but from the Supreme Court's decision in Buckley. Because a broader definition of "political committee" could unduly threaten the speech of "groups engaged purely in issue discussion"—as opposed to those engaged in "campaign related" activity—Buckley held that this narrowing construction was constitutionally required. Id.

Twenty-six years after Buckley, Congress passed the Bipartisan Campaign Reform Act of 2002 ("BCRA"), which amended FECA by adding new disclosure requirements. BCRA was aimed in part at regulating corporate and union spending on ads that, though nominally related to political issues, were plainly intended to influence voters in upcoming federal elections. See McConnell, 540 U.S. at 126–32. To capture these "so-called issue ads," id. at 126, Congress created a new category of communications, "electioneering communication[s]," which are television advertisements that air within sixty days of a federal election, clearly identify a

candidate running for federal office, and target the relevant electorate, 52 U.S.C.

§ 30104(f)(3)(A)(i).  Under BCRA, an organization that spends over $10,000 per calendar year

on electioneering communications must file a statement disclosing information about itself, the

candidates identified in the communications, the recipients of any disbursements, and any donors

who have given over $1,000 to the organization toward electioneering communications since the

beginning of the preceding calendar year.  Id. § 30104(f)(1)–(2); 11 C.F.R. § 104.20(c).[1]

"[E]lectioneering communications" must also include disclaimers noting the name of the entity

that paid for the ad and whether the ad was authorized by a candidate.  52 U.S.C. § 30120(a); see

11 C.F.R. § 100.11(c)(3).

The FEC, which is tasked with enforcing FECA, is an independent agency with six

Commissioners.  See 52 U.S.C. § 30106(a)(1).  The Commission has chosen not to adopt a rule

that would further clarify the meaning of Buckley's "major purpose" limitation.  Instead, it

determines on a case-by-case basis whether particular entities have a major purpose of

nominating or electing a candidate.  See Shays v. FEC, 511 F. Supp. 2d 19, 30 (D.D.C. 2007).

Any person or entity may file a complaint with the FEC alleging a FECA violation.  52

U.S.C. § 30109(a)(1).  If four or more Commissioners find "reason to believe" that FECA was or

will soon be violated, then the Commission "shall . . . investigat[e]" the complaint.  Id.

§ 30109(a)(2).  If fewer than four Commissioners find "reason to believe" that FECA was or will

---

[1] More specifically, FECA requires electioneering communication reports to contain "the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to the person making the disbursement during the period beginning on the first day of the preceding calendar year and ending on the disclosure date."  52 U.S.C. § 30104(f)(2)(F).  With respect to organizations like AAN, the Commission by regulation has interpreted the statute's reference to such contributors as limited to donations "*made for the purpose of furthering electioneering communications*."  11 C.F.R. § 104.20(c)(10) (emphasis added).  The D.C. Circuit has upheld this "purpose requirement" against challenge under the Administrative Procedure Act.  Van Hollen, Jr. v. FEC, 811 F.3d 486, 489–90 (D.C. Cir. 2016).

soon be violated, the complaint is dismissed.  See id. § 30106(c).  When a complaint is dismissed, Commissioners voting against enforcement must provide a statement of reasons explaining their dismissal decision.  See FEC v. Nat'l Republican Senatorial Comm., 966 F.2d 1471, 1476 (D.C. Cir. 1992).  "Any party aggrieved" by an FEC dismissal decision may petition for this Court's review.  52 U.S.C. § 30109(a)(8)(A).  If the Court finds the agency's dismissal to be "contrary to law," it can direct the FEC to take action within thirty days that "conform[s] with" the Court's ruling.  Id. § 30109(a)(8)(C).  If the Commission fails to take action to conform with the Court's order, the administrative complainant may sue the alleged FECA violator directly "to remedy the violation involved in the original complaint."  Id.

B.  Procedural History

The Court's previous Opinions extensively detail AAN's electioneering communications, the FEC's two deadlocks, and the controlling Commissioners' two Statements of Reasons for not opening an investigation.  See CREW v. FEC, ("CREW I"), 209 F. Supp. 3d 77 (D.D.C. 2016); CREW v. FEC ("CREW II"), 299 F. Supp. 3d 83 (D.D.C. 2018).  The Court will only summarize the key points here.

1. The FEC's First Dismissal

In 2012, CREW and its then-executive director filed an administrative complaint with the FEC alleging that, between July 23, 2009 and June 30, 2011, AAN operated as an unregistered political committee.  A tax-exempt § 501(c)(4) organization, AAN's self-described mission is to "encourage and promote 'center-right policies based on the principles of freedom, limited government, American exceptionalism, and strong national security.'"  Motion to Dismiss ("MTD") at 6 (quoting AAN, *About AAN*, https://americanactionnetwork.org/about).  To that end, it spent large sums of money on political advertisements.  From mid-2009 to mid-2011,

AAN devoted about $4 million to independent expenditures (ads directly imploring voters to support or oppose federal candidates) and $13.7 million to electioneering communications (ads identifying candidates near an election and targeting the relevant electorate) out of its $27.1 million in total spending.  CREW alleged in its administrative complaint that this spending qualified AAN as a political committee within the meaning of FECA, as supplemented by Buckley's "major purpose" test, and that AAN violated FECA by not complying with the disclosure requirements for such entities.

The FEC's Office of General Counsel recommended that the Commissioners find reason to believe AAN violated FECA and open an investigation.  The Commission deadlocked 3-3 on that recommendation, which closed the case.  The three controlling Commissioners, *i.e.* those who declined to proceed, issued a joint Statement of Reasons in which they counted only the $4 million that AAN had spent on express advocacy in assessing whether AAN's major purpose was election-related.  In re Am. Action Network, Inc., Statement of Reasons of Chairman Lee E. Goodman and Commissioners Caroline C. Hunter and Matthew S. Petersen ("First Statement of Reasons"), MUR No. 6589, at 20 (July 30, 2014).[2]  In so doing, they categorically deemed all of AAN's electioneering communications to be "genuine issue advocacy."  Id. at 19–21.  The Commissioners reasoned that this approach was required by appellate precedent applying the First Amendment to political advertising.  Id. at 13–16, 21–24.  While the controlling Commissioners devoted the vast majority of the Statement of Reasons to that legal analysis, they added in a footnote that "the constitutional doubts raised here militate in favor of cautious exercise of [their] prosecutorial discretion."  Id. at 23 n.137.  More on that later.

---

[2] For all administrative documents related to this case, including the various Statements of Reasons, see the FEC's webpage dedicated to CREW's complaint.  FEC, Am. Action Network, MUR No. 6589, https://www.fec.gov/data/legal/matter-under-review/6589.

CREW sued the FEC, and AAN intervened to protect its interests. CREW contended that the Commission had acted "contrary to law" in dismissing the complaint, and the Court agreed. The Court held that it was erroneous under FECA to categorize all electioneering communications as genuine issue advocacy. CREW I, 209 F. Supp. 3d at 92. At the same time, the Court rejected CREW's invitation to hold that all electioneering communications were *per se* political advocacy to be counted in determining AAN's major purpose. Id. at 93. The Court remanded the case to the Commission, instructing it to carefully consider the ads in question rather than simply presume that they were all issue advocacy. Id. at 95.

### 2. The FEC's Second Dismissal

On remand, the Office of General Counsel again recommended an investigation, and the Commission again deadlocked, with the same three Commissioners finding no reason to believe AAN had violated FECA. The agency thus dismissed CREW's complaint anew. This time, the Statement of Reasons issued by the controlling Commissioners analyzed the ads individually, weighing several factors to determine whether each electioneering communication should count toward an election-related major purpose. In re Am. Action Network, Inc., Statement of Reasons of then-Chairman Matthew S. Petersen and Commissioners Caroline C. Hunter and Lee E. Goodman ("Second Statement of Reasons"), MUR No. 6589, at 6–17 (Oct. 19, 2016). These factors included (1) the extent to which the ad's language focuses on "elections, voting, political parties," and the like; (2) "the extent to which the ad focuses on issues important to the group or merely on the candidates referenced in the ad;" (3) "the content of the ad" (but "only to the extent necessary . . . to understand better the message being conveyed"); and (4) whether the ad "contains a call to action and, if so, whether the call relates to the . . . issue agenda or, rather, to the election or defeat of federal candidates." Id. at 5–6. As context, the controlling

Commissioners noted that while the ads at issue ran in the lead-up to the 2010 mid-term federal elections, they also preceded an anticipated lame duck congressional session.  Id. at 6–8.  This meant, the Commissioners reasoned, that some ads might be properly categorized as genuine issue advocacy imploring constituents to encourage their representative to support or oppose potential legislation, not as election-related communication.  Id.

The three controlling Commissioners went on to find that many of the ads at issue were indeed genuine issue advocacy that did not reflect an election-related purpose, even if they met the statutory criteria of "electioneering communications."  Id. at 8–17.  The controlling Commissioners included in this category of "genuine issue advocacy" ads such as "Skype," which expressly identified Congresswoman Dina Titus, a Democrat from Nevada who was narrowly defeated in her 2010 reelection bid:

> Person l: *Hey, what's up?*
>
> Person 2: *Hey. You have to check out the article I just sent you. Apparently convicted rapists can get Viagra paid for by the new health care bill.*
>
> Person 1: *Are you serious?*
>
> Person 2: *Yep. I mean, Viagra for rapists? With my tax dollars? And Congresswoman Titus voted for it.*
>
> Person 1: *Titus voted for it?*
>
> Person 2: *Yep. I mean, what is going on in Washington?*
>
> Person 1: *In November, we need to tell Titus to repeal it.*  [Superimposed text: "Tell Congresswoman Titus to vote for repeal in November.  Vote Yes on H.R. 4903. (202)225-3252."]

Id. at 14.  The Commissioners concluded that this ad (and all others mentioning healthcare) did not reflect an election-related purpose, explaining that the ads' criticisms "are couched in terms of past votes taken by the named officeholder and are accompanied by calls to action designed to

influence the officeholders' votes in the lame-duck session." Id. This conclusion led the controlling Commissioners again to dismiss CREW's complaint. Id. at 18. The Second Statement of Reasons nowhere mentions prosecutorial discretion as a reason for the dismissal.

CREW then challenged the second dismissal, AAN again intervened, and the Court again held that the dismissal was contrary to FECA. The Court concluded that while the controlling Commissioners did not repeat the mistake of categorically excluding all of AAN's electioneering advertisements as not indicative of an election-related major purpose, they still erred by applying a multi-factor test that ignored Congress's presumption that such ads are designed to advance the election of a federal candidate. CREW II, 299 F. Supp. 3d at 98. That presumption in mind, the Court strained to accept the controlling Commissioners' position that an attack ad focused a Congresswoman's past vote on the Affordable Care Act was designed to change her view rather than to oust her from office in an election only weeks away. Id. at 98–99. The Court thus remanded the complaint to the agency with instructions to reconsider the dismissal in light of Congress's intent. Id. at 101.

This time, however, the agency failed to conform to the Court's Order within thirty days, which gave CREW the right to file this citizen suit. See 52 U.S.C. § 30109(a)(8)(C) (permitting an administrative complainant to bring suit directly against the alleged violator "to remedy the violation involved in the original [administrative] complaint" when the FEC fails to comply with a Court order within thirty days). Thirty-four days after the Court's Order, CREW filed suit. AAN now moves to dismiss CREW's complaint. The Court held a hearing on the motion on August 6, 2019.

## II. Legal Standards

AAN moves to dismiss CREW's complaint for lack of subject-matter jurisdiction and failure to state a claim. When evaluating a motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), courts must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged." Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (cleaned up). But courts need not accept inferences unsupported by facts alleged in the complaint, nor must they accept plaintiffs' legal conclusions. See, e.g., Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002). Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). To defeat a 12(b)(1) motion, a plaintiff must show "by a preponderance of the evidence that the Court has subject matter jurisdiction[.]" Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d 172, 176 (D.D.C. 2004). The Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citation omitted).

In analyzing a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the Court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This requires "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. To make this determination, the Court "must take all of the factual allegations in the complaint as true," id., and must "constru[e] the

complaint liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged," Stewart v. Nat'l Educ. Ass'n, 471 F.3d 169, 173 (D.C. Cir. 2006). Finally, the Court may only "consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." Id.

## III. Analysis

### A. Standing

AAN first challenges CREW's standing to bring its claims. The Constitution permits federal courts to hear "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Consitutional standing doctrine is rooted in this limitation, see FEC v. Akins, 524 U.S. 11, 20 (1994), and requires CREW to show three elements to meet the "irreducible constitutional minimum of standing," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). CREW must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016). AAN contends that CREW can meet neither the first nor third element. The Court takes each in turn.

#### 1. Injury in Fact

The Supreme Court has long recognized that FECA creates an informational right—the right to know who is spending money to influence elections, how much they are spending, and when they are spending it. See Akins, 524 U.S. at 24–25. Deprivation of this right inflicts an "'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." Id. at 21; see also Pub. Citizen v. U.S. Dep't of Justice, 491 U.S. 440, 449 (1989) (holding that denying plaintiffs information to "the extent [the statute] allows constitutes a sufficiently distinct injury to provide standing to sue"); Friends of Animals v. Jewell, 828 F.3d

989, 992 (D.C. Cir. 2016) (holding that "the existence and scope of an injury for informational standing purposes is defined by Congress").

There is no dispute that the disclosures CREW seeks are required of political committees under FECA. AAN nevertheless insists that CREW has suffered no cognizable injury here because it cannot vote and, as a 501(c)(3) organization, cannot engage in political activity. As AAN sees it, CREW alleges mere derivative harm on behalf of the public, which is not sufficiently particularized to support standing. AAN misconstrues CREW's alleged informational injury. In <u>Akins</u>, the Supreme Court held that voters were injured where they claimed that information to which they were entitled under FECA "would help them (*and others to whom they would communicate it*) to evaluate candidates for public office[.]" 524 U.S. at 21 (emphasis added). The D.C. Circuit has since explained that a plaintiff suffers injury in fact "where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them." <u>Jewell</u>, 824 F.3d at 1040–41 (internal quotation marks omitted). The helpfulness of the information does not depend on the plaintiff's status as a voter.

Indeed, a fellow court in this district has read these precedents to confer standing to other groups who, like CREW, "engage[] in a number of campaign-finance related activities— including public education, litigation, administrative proceedings, and legislative reform efforts—where the sought-after information would likely prove useful." <u>Campaign Legal Ctr. v. FEC</u>, 245 F. Supp. 3d 119, 127 (D.D.C. 2017). In that case, Judge Bates concluded that two groups had standing to sue the FEC to seek disclosure of the true names of individuals who had contributed to super PACs through corporate straw donors. He reasoned that, although neither group could vote, there was "no reason to doubt" that the information sought—which FECA

required to be disclosed—would be useful to the organizations and to others to whom they would communicate it.  Id. at 127.  Those organizations' inability to cast a ballot was irrelevant.  See id. at 128.

So too here.  "[T]here is no reason to doubt" CREW's claim that the information sought would help it in its activities.  See Jewell, 824 F.3d at 1040–41.  It has pled that it regularly reviews disclosure reports required by FECA and uses the information they contain regarding campaign expenditures for a host of programmatic activities, such as "look[ing] for correlations between . . . spending on independent campaign activity that . . . benefits a candidate, and that member's subsequent congressional activities[.]"  Compl. ¶ 15; see also id. ¶¶ 11–14.  And, again, there is no serious dispute that if AAN was operating as a political committee—which is a merits question—then FECA required the disclosures CREW seeks.  See 52 U.S.C. § 30104. That's all Akins and Jewell require.[3]

AAN cites a host of cases in which courts in this circuit found that plaintiffs lacked standing to challenge FEC dismissals.  But none dealt with the informational injury alleged here: a putative political committee's failure to disclose its donors.  It is an unremarkable observation that some other plaintiffs have been found to lack standing to challenge the FEC's dismissals of complaints, given that "the nature of the information allegedly withheld is critical to the standing analysis."  Common Cause v. FEC, 108 F.3d 413, 417 (D.C. Cir. 1997).  A plaintiff has no standing, for example, to learn solely "whether a violation of the law has occurred," id. at 418, or to have the Commission "get the bad guys," Nader v. FEC, 725 F.3d 226, 230 (D.C. Cir. 2013) (internal quotation marks omitted).  The case law distinguishes between information in the

---

[3] Because the Court concludes that CREW has alleged an informational injury that confers standing, it need not address its alternative theory based on programmatic harms.

form of legal conclusions and information in the form of facts; a plaintiff has no particularized right to the former, but does to the latter, so long as FECA requires that disclosure.

Each of the cases on which AAN relies falls into the former camp. It places heavy emphasis on Nader, in which Ralph Nader had filed an administrative complaint alleging that lawyers had made undisclosed in-kind contributions to John Kerry's presidential campaign in the form of legal services designed to keep Nader off the ballot. The D.C. Circuit rejected Nader's attempt to frame this as an "informational injury," noting that he had "ask[ed] the FEC to compel information . . . in the hope of showing that [the attorneys] violated [FECA's] prohibitions on undisclosed 'contributions' and 'expenditure[s].'" Id. The Circuit explained that "this amount[ed] to seeking disclosure to promote law enforcement"—as distinguished from Supreme Court and D.C. Circuit case law upholding standing where plaintiffs sought disclosure "related to their informed participation in the political process." Id. That is what CREW seeks here.

AAN fares no better in relying on several cases in which courts found that CREW lacked standing to challenge the FEC's dismissal of its complaint. In CREW v. FEC ("Murray Energy"), 267 F. Supp. 3d 50 (D.D.C. 2017), for example, Judge Leon concluded that CREW lacked standing because there was "no serious argument that the provision of FECA that plaintiffs invoked . . . entitle[d] them to information in any reasonably direct way." Id. at 54 (citing 2 U.S.C. § 441f). He distinguished the case from Akins on that basis, explaining that "the complainants [there] had a cognizable injury because they sought to enforce a provision of the FECA that would make the target of the enforcement action subject to additional reporting requirements." Id. (citing Akins, 524 U.S. at 21). CREW's failure to establish standing had nothing to do with the nature of how it might use the information—it rested on Judge Leon's

conclusion that the FECA provision invoked did not entitle it to any information at all based on its allegations.

Nor does <u>CREW v. FEC</u> ("<u>Americans for Tax Reform</u>"), 475 F.3d 337 (D.C. Cir. 2007), help AAN. There, the D.C. Circuit concluded that CREW lacked standing to seek information concerning the precise value of a purported in-kind contribution in part because the "precise value—if that could be determined—would add only a trifle to the store of information about the transaction already publicly available." <u>Id.</u> at 340. Further, the Circuit agreed with the district court's conclusion that FECA does not require disclosure of the type of information sought. <u>See id.</u> at 340; <u>see also</u> <u>Murray Energy</u>, 267 F. Supp. 3d at 54 (reaching the same conclusion). Here, by contrast, there is no dispute that FECA requires the disclosure of information by political committees; rather, the dispute on the merits is whether AAN operated such a committee. Because FECA requires the disclosure of the information CREW seeks and because CREW has suffered a cognizable informational injury, it has established injury in fact.

### 2. *Redressability*

Next, AAN insists that whatever informational injury CREW may have suffered, CREW still lacks standing because the injury is not likely to be "redressed by a favorable [judicial] decision." <u>Lujan</u>, 504 U.S. at 561 (internal quotation marks omitted). CREW's injury cannot be redressed, AAN maintains, because "CREW cannot obtain broader relief here than the Commission itself could seek and obtain," and under FECA "'the Commission has no authority to order anyone to report anything.'" MTD at 18 (quoting <u>Americans for Tax Reform</u>, 475 F.3d at 340).

AAN's argument misses the mark. Regardless whether the Commission could compel an organization to disclose its donors upon a finding that it violated FECA's political committee

regulations, there is little doubt it could seek a court order requiring such disclosure. Congress

has authorized the FEC to "institute a civil action for relief, including a permanent or temporary

injunction, restraining order, or any other appropriate order" to enforce FECA. 52 U.S.C.

§ 30109(a)(6)(A). And "FECA grants district courts broad authority to fashion remedies for

violations of the statute." FEC v. Craig for U.S. Senate, 816 F.3d 829, 847 (D.C. Cir. 2016); 52

U.S.C. § 30109(a)(6)(B) (authorizing district courts to "grant a permanent or temporary

injunction, restraining order, or other order"). Indeed, courts have used this authority to order

FECA-mandated disclosures. See, e.g., FEC v. Comm. of 100 Democrats, 844 F. Supp. 1, 8

(D.D.C. 1993) (ordering defendant committee to "fil[e] scheduled reports disclosing all

contributions received and disbursements made"). Accordingly, the disclosure CREW seeks is

well within this Court's power to award. Its alleged injury is therefore redressable.[4]

    B. *CHGO* and Prosecutorial Discretion

    AAN next contends that a recent D.C. Circuit case—decided after this suit was filed—

precludes judicial review of CREW's complaint. In CREW v. FEC ("CHGO"), the Circuit held

that the FEC's dismissal of an administrative complaint in the exercise of its prosecutorial

discretion was not reviewable by the district court. 892 F.3d 434, 441 (D.C. Cir. 2018). AAN

argues that CHGO ends this case because the Statement of Reasons that the Court reviewed in

---

[4] AAN's contention that the FEC is limited to assessing penalties through its Administrative Fines Program is also unavailing. Under that program, as AAN notes, "[t]he sanctions available . . . are focused on formulaic 'civil money penalty' relief . . . for political committees that file their reports either late or not at all." MTD at 20 (quoting 11 C.F.R. §§ 111.42–.43). But the Program does not preclude the Commission from filing suit seeking equitable relief. See 11 C.F.R. § 111.31 ("If the Commission determines that the violation should not be subject to [the Administrative Fines Program], then the violation will be subject to all sections of subpart A," which includes civil suit.). So, the existence of this program does nothing to undermine redressability, even assuming the remedy that CREW seeks here is limited to one the FEC could implement. Had it investigated CREW's complaint and found a violation, the FEC might have chosen to fine AAN and leave it at that; but it might also have chosen to seek a court order for disclosure, as CREW does here.

CREW I twice cited "prosecutorial discretion" as grounds for not opening an investigation, which rendered the dismissal unreviewable. Having been powerless to review the initial dismissal, AAN's theory goes, the Court could not order the FEC to conform to its ruling in CREW II. And, because the FEC's disregard of that order is the predicate for CREW's citizen suit, it is unreviewable as well.

The Court does not read CHGO to preclude judicial review here. CHGO based its holding on Heckler v. Cheney, where the Supreme Court held that agency nonenforcement decisions are "presumptively unreviewable" under the Administrative Procedure Act to the extent they are "committed to agency discretion by law." CHGO, 892 F.3d at 438–41 (citing Heckler, 470 U.S. 821, 830, 832–33 (1985)). Nonenforcement decisions receive this broad reprieve from judicial review because, in deciding to forgo enforcement, agencies

> must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all. An agency generally cannot act against each technical violation of the statute it is charged with enforcing.

Heckler, 470 U.S. at 831–32; see CHGO, 892 F.3d at 439 & n.7 (quoting this passage). The controlling Commissioners in CHGO relied on the very type of practical and prudential considerations that Heckler indicated were not subject to judicial review. Their Statement of Reasons explained

> that the statute of limitations had expired or was about to; that the association . . . no longer existed; that the association had filed termination papers with the IRS four years earlier; that it had no money; that its counsel had resigned; that the "defunct" association no longer had any agents who could legally bind it; and that any action against the association would raise "novel legal issues that the Commission had no briefing or time to decide."

CHGO, 892 F.3d at 438 (quoting Statement of Reasons). Weighing these considerations, the three Commissioners concluded that the "case did not warrant further use of Commission resources." Id.

While finding the dismissal unreviewable under Heckler, the CHGO panel majority acknowledged prior Supreme Court and D.C. Circuit cases holding that FEC nonenforcement decisions, unlike those of other agencies, are reviewable for a determination of whether they are "contrary to law" when based on an interpretation of FECA. CHGO, 892 F.3d at 441 n.11 (citing Akins, 524 U.S. at 26 (holding that there may be review under FECA if the agency's action was based entirely on its interpretation of the statute); FEC v. Democratic Senatorial Campaign Comm. ("DSCC"), 454 U.S. 27, 37 (1981) (noting that FEC dismissals based on its interpretation of FECA is subject to judicial review to determine whether its interpretation is "contrary to law")); see also Orloski v. FEC, 795 F.2d 156, 161 (D.C. Cir. 1986) ("The standard to be applied by this court in reviewing the FEC's decision not to investigate Orloski's complaint is whether the FEC has acted 'contrary to law.'"). The Circuit reconciled these competing precedents by distinguishing nonenforcement decisions that are "committed to agency discretion"—due to the prudential considerations present in both Heckler and CHGO—from decisions "based entirely on [the agency's] interpretation of the statute." CHGO, 892 F.3d at 441 & n.11. Dismissals in the latter category are reviewable; those in the former are not.

Nothing in CHGO suggests that the mere invocation of the phrase "prosecutorial discretion" precludes judicial review. For good reason. The use of the term could indicate at least two types of concerns. In contrast to the prudential-based concerns at the heart of Heckler, agencies frequently exercise a kind of prosecutorial discretion when they consider whether a statute prohibits a certain type of conduct at the margins. Reviewing an agency's interpretation

of a statute in that context is squarely within the courts' expertise, particularly where the agency's reading of the statute implicates constitutional jurisprudence.  Cf. Akins v. FEC, 101 F.3d 731, 740 (D.C. Cir. 1996), vacated on other grounds, 524 U.S. 11 (1998) (noting that review of agency interpretation of judicial opinions is especially salient when the "precedent is based on constitutional concerns, which is an area of presumed judicial competence'"); see also CREW I, 209 F. Supp. 3d at 87 ("[C]ourts need not, and should not, defer to agency interpretations of opinions written by courts.") (collecting cases).

What precludes judicial review, then, is not a talismanic recitation of the phrase "prosecutorial discretion" but reliance by the FEC on factors particularly within its expertise in exercising that discretion.  It would upend the distinction that CHGO drew—and gut the statutory scheme that Congress created in FECA—to foreclose judicial review whenever the FEC bases its dismissal on legal interpretations couched as "prosecutorial discretion" or, worse yet, simply sprinkles the term throughout a Statement of Reasons in order to circumvent judicial review.  See CREW v. FEC, 923 F.3d 1141, 1149 (D.C. Cir. 2019) (Pillard, J., dissenting from denial of rehearing en banc in CHGO) (suggesting as much, perhaps, by noting that the FEC has "cited prosecutorial discretion in every statement of reasons . . . since the district court decision in" CHGO).

Judge Contreras had a similar take on CHGO in a recent opinion declining to review the FEC's dismissal of yet another of CREW's administrative complaints regarding a putative political committee.  See CREW v. FEC ("New Models"), 380 F. Supp. 3d 30 (D.D.C. 2019). There, the controlling Commissioners based their decision on "three reasons."  Id. at 37.  The first two were legal.  See id. (discussing the FEC's conclusions that New Models "fell outside the statutory definition of a political committee" and that its "major purpose was not the nomination

or election of candidates for federal elections"). The third, however, reflected prosecutorial discretion rooted in prudential concerns. The Commissioners reasoned that "proceeding further would not be an appropriate use of Commission resources" because "New Models 'appear[ed] no longer active,'" had "liquidated, terminated, dissolved, or otherwise ceased operations," and had engaged in the activity in question years earlier. Id. at 37–38 (quoting Statement of Reasons) (alternation in original). Judge Contreras concluded that CHGO precluded judicial review even though most of the Statement of Reasons involved legal interpretations. Id. at 44–45. However, he then suggested that CHGO would not bar review when the FEC merely uses the term "prosecutorial discretion" but grounds that discretion in legal precedent: "Had the Controlling Commissioners invoked prosecutorial discretion based on their legal analysis, . . . the Court, perhaps, could undertake a more piercing review." Id. at 42 n.12.

This case presents the situation that Judge Contreras hypothesized. The controlling Commissioners' first Statement of Reasons spans 27 single-spaced pages and 153 footnotes. Virtually all its analysis is devoted to explaining why, in the Commissioners' view, it would violate Supreme Court and other lower court precedent to consider AAN's electioneering communications in determining whether the organization satisfied Buckley's "major purpose" test. The second Statement of Reasons, following this Court's initial remand, comprised an additional 19 single-spaced pages. It exclusively examines whether AAN's challenged electioneering advertisements evince an electoral purpose and concludes that most do not.

There are exactly two references to "prosecutorial discretion" in the first Statement and none in the second.[5] The first reference appears 23 pages into the initial Statement of Reasons in

---

[5] Generally, the Court would review only the second Statement of Reasons, which as a formal matter superseded the first on remand. In this case, however, the Court thinks it prudent

footnote 137. The footnote begins by noting the Commissioners' view that a then-recent Seventh Circuit opinion "casts grave constitutional doubt" on the Office of General Counsel's "expansive approach" to applying <u>Buckley</u>'s major purpose test. First Statement of Reasons at 23–24 & n.137. Then, analogizing to the rule of constitutional avoidance in statutory construction, the footnote continues:

> Moreover, the constitutional doubts raised here militate in favor of cautious exercise of prosecutorial discretion. <u>See</u> <u>Heckler v. Chaney</u>, 470 U.S. 821, 831 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.").

<u>Id.</u> The only other reference to prosecutorial discretion appears in the concluding paragraph of the first Statement of Reasons, which reads in full:

> AAN is an issue-advocacy group that only occasionally engaged in express advocacy. As such, it cannot and should not be subject to the pervasive and burdensome requirements of registering and reporting as a political committee. For that reason, *and in exercise of our prosecutorial discretion*, we voted against finding reason to believe AAN violated the Act by failing to register and report as a political committee.

<u>Id.</u> at 27 (cleaned up) (emphasis added).

Neither reference mentions resource-based or other prudential considerations of the sort cited by the controlling Commissioners in <u>CHGO</u> and identified by the Supreme Court in <u>Heckler</u> as grounds to shield discretionary nonenforcement decisions from judicial review. Rather, the only factors that the Commissioners explicitly relied upon to ground their exercise of prosecutorial discretion are the "constitutional doubts" stemming from their interpretation of applicable case law. In the absence of any discussion of practical considerations, the Commissioners' observation that their "constitutional doubts . . . militate[d] in favor of cautious

---

to consider both because AAN's premise is that under <u>CHGO</u>, the Court should have never reviewed the first statement, let alone the second.

exercise of [their] prosecutorial discretion," id. at 23–24 n.137, is best understood as a conclusion that FECA, read in light of constitutional doctrine, did not permit an enforcement action. As CHGO explained, dismissals premised on those sorts of legal interpretations are judicially reviewable. 892 F.3d at 441 n.11.

AAN resists this conclusion by emphasizing the conjunctive "and" in the phrase italicized above from the first Statement of Reasons' concluding paragraph. In its view, the phrase shows that the Commissioners' invocation of prosecutorial discretion was distinct from the legal interpretations to which they devoted virtually all their reasoning. The Court is not convinced. The Commissioners' two references to prosecutorial discretion are tethered to their legal reasoning. Again, in footnote 137 of the first Statement of Reasons, the Commissioners explained that their "constitutional doubts" (about whether the case law supported a finding that AAN was operating as a political committee) counseled against enforcement. And the reference to prosecutorial discretion in the Statement of Reasons' concluding paragraph adds no further explanation for its application. It simply directs the reader back to the footnote. All roads, then, lead to legal interpretations.

Counsel for AAN suggested at the hearing that the Commission's reference to "constitutional doubts" in footnote 137 of the first Statement of Reasons should be understood as indicating an aversion to the litigation risk of enforcement. AAN maintains that this nod to litigation risk reflected some of the factors Heckler identified as squarely within agency expertise, such as "whether the agency is likely to succeed if it acts and whether the action [] best fits the agency's overall policies." Hr'g Tr. 14:19–22 (Aug. 6, 2019) (Rough). Even accepting AAN's equation of "constitutional doubts" with "litigation risk" (which would be charitable,

given that the phrase "litigation risk" never appears in either Statement of Reasons), the Court is not persuaded.

"Litigation risk" could refer to two categories of concerns. First, as counsel argued, a concern over litigation risk could reflect the traditional resource-allocation decisions that would render a nonenforcement decision unreviewable. An agency might conclude that the costs of litigating a potential action outweigh the likely benefits of enforcing a statute on the margins. But "litigation risk" could also mean that the agency simply doubts that a court would sustain enforcement based on its application of the statute and precedent to the facts. That is a concern based on a legal interpretation, and it matches the words actually used by the controlling Commissioners here. See First Statement of Reasons at 23–24 n.137 ("[T]he constitutional doubts raised here militate in favor of cautious exercise of prosecutorial discretion."). If doubts as to how a court would rule were enough to preclude review, nearly every agency legal interpretation would be insulated from judicial oversight. As Judge Bates recently explained in the context of an APA challenge to a general nonenforcement policy:

> [W]here an agency asserts that a nonenforcement policy is unlawful and then asserts "litigation risk" as a separate ground for the policy's rescission, there are reasons to be . . . suspicious. After all, if an agency could insulate from judicial review any legal interpretation simply by . . . offering as an additional, "discretionary" justification the assertion that a court would likely agree with the agency's interpretation, then [precedent permitting judicial review] would be a dead letter.

NAACP, 298 F. Supp. 3d at 233. "[S]uch an assertion," Judge Bates continued, "would depend (at least in part) on the correctness of the agency's view of the policy's unlawfulness," which is reviewable. Id. at 233–34.

So, to the extent that a concern about "litigation risk" can be divined from the controlling Commissioners' mention of "constitutional doubts," that is no bar to review. Any such concern

would be part-and-parcel of the Commissioners' reviewable legal interpretations.  The Court

declines to infer several layers of meaning into the Commissioners' purported "constitutional

doubts;" it will instead take them at their word and find that their interpretation of FECA in light

of First Amendment doctrine is what led them to dismiss the complaint.

In sum, the controlling Commissioners expressed skepticism over the constitutionality of

the Office of General Counsel's legal approach and concern that action on CREW's complaint

would be legally suspect.  The Commissioners' passing invocation of prosecutorial discretion

was rooted entirely in those legal misgivings.  The first Statement of Reasons cannot be fairly

read to imply resource-based or other practical considerations, including litigation risk, that the

Commissioners nowhere mentioned.  And the second Statement of Reasons—issued on remand

from CREW I and challenged in CREW II—does not mention prosecutorial discretion at all,

which only bolsters the conclusion that the Commission's dismissal of the case was premised

entirely on the controlling Commissioners' legal reasoning.[6]  Accordingly, the record

demonstrates that the Commissioners' decision was based on legal interpretations that FECA

authorizes the Court to review.  The Court will therefore deny AAN's motion to dismiss the

complaint as beyond judicial review.

C.  Post-June 30, 2011 Claims

CREW's complaint brings two claims.  First, that AAN became a political committee at

some point during 2009 or 2010 but failed to register as such.  And second, that as a consequence

_____

[6] AAN cites a string of cases that hold that an unreviewable discretionary decision remains unreviewable even if there are reviewable legal standards baked in.  See Reply at 11–12 (citing, inter alia, ICC v. Bhd. of Locomotive Eng'rs, 482 U.S. 270, 282–83 (1987)).  But those decisions are inapposite because here both Statements of Reasons were entirely based on legal conclusions.  See CHGO, 892 F.3d at 442 ("The law of this circuit rejects the notion of carving reviewable legal rulings out from the middle of non-reviewable actions.") (internal quotation marks omitted).

of not registering, AAN has since failed to meet the reporting requirements that FECA imposes on political committees. To remedy these alleged violations, CREW asks the Court to "[d]eclare that AAN is a political committee" and that it became one "on July 23, 2009, or, alternatively, no later than May 6, 2010, and that it continues to be a political committee." Compl. at 21. It further seeks an order requiring AAN to register as a political committee and to make the requisite disclosures of donors "who contributed to the organization at any time." Id.

AAN objects to the temporal scope of CREW's claims and asks the Court to dismiss all claims concerning AAN's conduct after June 2011. It does so on two grounds. First, AAN contends that the Court lacks subject-matter jurisdiction over those claims because they were not part of CREW's "original complaint" at the administrative level. See 52 U.S.C. § 30109(a)(8)(C) (A "complainant may bring . . . a civil action to remedy the violation involved in the original complaint."). Second, it insists that CREW has pled no facts about AAN's post-June 2011 activity, meaning that it has failed to state a claim for FECA violations in that time period. CREW responds that it has alleged a singular violation, not neatly bifurcated into separate pre- and post-June 2011 claims. It argues that AAN's alleged failure to register prior to 2011 necessarily encompasses post-2011 failures to report. Why? Because once an entity is a political committee, it remains one in perpetuity until it files termination papers with the FEC. See 52 U.S.C. § 30103(d)(1); 11 C.F.R. § 102.3(a)(1). Thus, CREW says, if AAN was an unregistered political committee, it violated FECA not only by failing to register but also by failing to report in subsequent years. See 52 U.S.C. § 30104.

The Court agrees with AAN that the plain text of FECA permits it to consider only the claims that CREW alleged in its original administrative complaint—*i.e.*, that AAN's pre-July 2011 activity rendered it a political committee. There is good reason that FECA limits citizen

suits to alleged "violation[s] involved in the original complaint" to the FEC.  52 U.S.C.

§ 30109(a)(8)(C).  Administrative exhaustion requirements ensure that an agency is able to take

a first pass at the facts alleged and to make determinations using its relative expertise.

Exhaustion also promotes conciliatory efforts, which FECA emphasizes.  See id.

§ 30109(a)(4)(A)(i) (requiring the Commission, upon finding reason to believe a FECA violation

occurred, to engage in conciliation efforts "to correct or prevent such violation by informal

methods of conference, conciliation, and persuasion, and to enter into a conciliation agreement

with any person involved").  The Court's role is to review the agency's determinations, not to

make them in the first instance.  And here, the FEC has not had occasion to examine any facts or

allegations concerning AAN's post-June 2011 activity.

To illustrate, suppose the facts reveal that electing candidates was not AAN's major

purpose prior to July 2011 and therefore it was under no obligation to register as a political

committee.  It would violate the principles underlying administrative exhaustion to then

determine, based on its activity during, say, the 2014 election cycle, that AAN came to have such

a major purpose.  The FEC has not been presented with a complaint about AAN's activities after

2011 and thus has not had occasion to assess AAN's conduct during that period.  CREW's

administrative complaint only alleged violations of FECA between July 2009 and June 2011, and

it chose not to file subsequent complaints challenging AAN's conduct during other periods.  As a

result, to the extent that CREW's complaint seeks to establish AAN's liability for conduct

occurring after June 2011, the Court must dismiss CREW's claims.  In assessing AAN's liability

on Count I (alleging a failure to register) and Count II (alleging a failure to report), the Court will

consider only the facts alleged during the period reviewed by the FEC.

That does not completely resolve the matter, however.  As the Court noted at the hearing, if the facts were to establish a registration violation during the period covered by CREW's original complaint, AAN's subsequent disclosure obligations could be implicated as a matter of remedy.  CREW's alleged injury is the lack of information that FECA requires political committees to disclose, see 52 U.S.C. § 30104, and political committees must disclose that information in perpetuity until they take certain steps to terminate that status.  AAN has not taken those steps (because, of course, it has not been recognized as a political committee).  So what would be an appropriate remedy for CREW's injury?  Were the Court to declare, as CREW requests, that AAN became a political committee at some point prior to July 2011, it might not adequately redress CREW's injury to limit any disclosure order to that time period.  AAN might have been able to shirk its reporting obligations for the better part of a decade, depriving CREW of information to which it was entitled, because of a failure to register as a committee.  An appropriate remedy would not reward intransigence; rather, it would ensure that "[t]he injured party is . . . placed, as near as may be, in the situation [it] would have occupied if the wrong had not been committed."  Albemarle Paper Co. v. Moody, 422 U.S. 405, 418–19 (1975) (citation omitted).  Making CREW "whole" might well require ordering AAN to disclose everything it would have had to disclose had it complied with the law in the first instance.

Considering post-June 2011 disclosures as a potential remedy would not appear to exceed the Court's subject-matter jurisdiction or violate any mandatory exhaustion rule.  While the Court agrees that it may not consider facts concerning time periods that have not been administratively exhausted to determine liability, it doubts it is so constrained in fashioning a remedy.  The statute permits this suit to "remedy the violation involved in the original complaint."  52 U.S.C. § 30109(a)(8)(C).  And Congress has conferred upon the courts broad

equitable powers to remedy FECA violations. See, e.g., Craig for Senate, 816 F.3d at 847. When Congress "[takes] care to arm the courts with full equitable powers," it reflects a desire that courts "be alert to adjust their remedies so as to grant the necessary relief" to ensure that "the compensation shall be equal to the injury." Albemarle Paper Co., 422 U.S. at 418–19 (citations omitted). Here, if CREW were to show that AAN violated FECA prior to June 2011 by failing to register as a political committee, Congress's broad grant of equitable powers in this context would likely authorize the Court to consider post-June 2011 information in crafting an appropriate remedy to ensure that CREW is placed as closely as possible in the position it would have been in had AAN complied with FECA in the first instance. Further, as described in more detail below, see infra Part III.D, the statutory scheme creates a potentially time-intensive process, including judicial review of an agency dismissal, before the citizen-suit provision can be invoked. It would be odd to conclude that Congress mandated periodic reporting requirements for political committees, created a time-intensive direct-suit mechanism to remedy FECA violations (including failure to register as a committee), but then declined to permit courts to consider any attendant legal violations post-dating a complaint when crafting a remedy. The Court therefore reserves the flexibility to consider whether, if a registration violation is found, the proper remedy would be to require AAN to disclose reporting information from post-June 2011.

A few clarifying points are in order. The Court is not suggesting that registration in 2009 or 2010 necessarily would have subjected AAN to all political committee disclosure requirements from then to the present. As AAN notes, it has never registered as a political committee because no agency or court has ever required it to do so. As a consequence, it could not have filed termination papers. FECA permits termination only if a committee files papers

indicating that "it will no longer receive any contributions or make any disbursements" that would qualify it as a political committee. 52 U.S.C. § 30103(d)(1); see also 11 C.F.R. § 102.3(a)(1). Thus, if AAN could show, in a remedy phase, that it met these criteria at some point after June 2011[7]—and therefore would have been entitled to terminate its registration then—an appropriate remedy would account for that.

AAN also raises an important point regarding any purported subsequent reporting obligations. As the law stands, there is dissonance between how an entity becomes a political committee and how it stops being one. Recall Buckley's gloss on FECA. Under FECA's terms, an entity is a political committee if it contributes or expends more than $1,000 in a calendar year to influence a federal election. 52 U.S.C. § 30101(4)(A). In Buckley, however, the Supreme Court concluded that imposing registration and reporting requirements on an entity meeting that statutory definition raised First Amendment concerns unless the entity's "major purpose" is "the nomination or election of a candidate." Buckley, 424 U.S. at 79; see also FEC v. Massachusetts Citizens for Life, Inc. ("MCFL"), 479 U.S. 238, 262 (1986). Under current law, once an entity becomes a political committee, it remains one in perpetuity until it (1) files termination papers with the FEC that require it to indicate that it (2) "will no longer receive any contributions or make any disbursements that would otherwise qualify it as a political committee." 11 C.F.R. § 102.3(a)(1) (emphasis added); see also 52 U.S.C. § 30103(d)(1). But an organization's major purpose can change. See MCFL, 479 U.S. at 262 (explaining that a group's "spending [may] become so extensive that the organization's major purpose may be regarded as campaign

---

[7] CREW asserts that public filings show this is not the case, but that's a matter for another day.

activity," thus rendering it "a political committee"); see also CREW I, 209 F. Supp. 3d at 94 (citing MCFL, 479 U.S. at 262).

There is scant, if any, authority on how Buckley affects the termination process. If a political committee seeks to terminate its registration, can the FEC require it to shun all electoral expenditures without running afoul of the First Amendment? Or, consistent with Buckley, may the group terminate its registration (and end its reporting obligations) if and when its major purpose ceases to be electoral? The Court need not answer these questions now—they would arise only in a remedies phase after a finding of a registration violation. Nor does the Court have to decide at this juncture how it would go about determining whether AAN's major purpose remained the same.[8] The parties will be given an opportunity to weigh in on these issues, as well as on how discovery on potential remedial issues should relate to discovery involving liability.

D. Statute of Limitations

AAN next asks the Court to dismiss CREW's claims as time-barred. Out of the gate, the parties dispute what the applicable statute of limitations is. FECA itself contains no explicit limitations period. As a result, courts have applied the catch-all five-year limitations period set forth in 28 U.S.C § 2462 to FECA enforcement actions brought by the Commission. See, e.g., CREW v. FEC, 236 F. Supp. 3d 378, 392 (D.D.C. 2017). AAN maintains that the same limitations period applies to FECA citizen suits. CREW counters that § 2462 only covers government enforcement actions, but it does not suggest an alternative period.

---

[8] At first blush, the proper procedure might be to shift the burden to AAN to demonstrate if and when it ceased to be a political committee. That would be consistent with how the process would work at the administrative level. Once registered, it would be incumbent on a political committee to terminate its registration, averring that it was not making expenditures (or, presuming the Buckley gloss applies to termination as well as registration, that its major purpose is no longer electoral).

The Court need not resolve this skirmish because even assuming § 2462 applies, it does not bar CREW's claims. Section 2462 gives a litigant five years to bring suit "from the date when the claim first accrued." 28 U.S.C. § 2462. "[T]he 'standard rule' is that a claim accrues 'when the plaintiff has a complete and present cause of action.'" Gabelli v. SEC, 568 U.S. 442, 448 (2013) (quoting Wallace v. Kato, 549 U.S. 384, 388 (2007)). A claim accrues "when 'the plaintiff can file suit and obtain relief.'" Heimeshoff v. Hartford Life & Acc. Ins. Co., 571 U.S. 99, 105 (2013) (quoting Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 201 (1997)); see also Earle v. District of Columbia, 707 F.3d 299, 306 (D.C. Cir. 2012) ("As a general rule, a claim normally accrues when the factual *and legal* prerequisites for filing suit are in place." (emphasis added) (cleaned up)); Oppenheim v. Campbell, 571 F.2d 660, 662 (D.C. Cir. 1978) ("Appellee's action 'accrued' when his right to resort to federal court was perfected.")

Here, CREW's claims did not accrue until April 19, 2018. This Court remanded CREW's complaint to the FEC on March 20, 2018, ordering the agency to conform within thirty days. CREW II, 299 F. Supp. 3d at 101. The agency failed to act on remand, and thirty days later CREW was entitled to sue under FECA. See 52 U.S.C. § 30109(a)(8)(C). FECA did not permit suit until then.

AAN's retort is unavailing. It contends that the conduct about which CREW complained occurred more than five years before it filed this suit. That doesn't make any difference. The question is not when the alleged violation occurred, but when the claim first could have been brought: that is, when CREW had a "complete and present cause of action." Gabelli, 568 U.S. at 448 (quoting Wallace, 549 U.S. at 388). "While it is theoretically possible for a statute to create a cause of action that accrues at one time for the purpose of calculating when the statute of

limitations begins to run, but at another time for the purpose of bringing suit," courts do "not infer such an odd result in the absence of any such indication in the statute." Bay Area Laundry & Dry Cleaning Pension Tr. Fund, 522 U.S. at 201 (quoting Reiter v. Cooper, 507 U.S. 258, 267 (1993)).[9]

There are several good reasons not to infer that result here. As an analogy, consider suits against the United States, which must be filed "within six years after the right of action first accrues." 28 U.S.C. § 2401(a). It is well-established in this Circuit that a "cause of action against an administrative agency 'first accrues,' within the meaning of § 2401(a), as soon as (but not before) the person challenging the agency action can institute and maintain a suit in court." Spannaus v. U.S. Dep't of Justice, 824 F.2d 52, 56 (D.C. Cir. 1987). That means that when a would-be plaintiff must exhaust its claims through a mandatory administrative regime, the clock does not tick. The Supreme Court explained the reasons for that rule in considering a contract dispute between a private party and the United States subject to an administrative exhaustion regime:

---

[9] The undersigned's decision in Bathiard v. Islamic Republic of Iran, 317 F. Supp. 3d 134 (D.D.C. 2018), rev'd on other grounds, Maalouf v. Islamic Republic of Iran, 923 F.3d 1095 (D.C. Cir. 2019), is not to the contrary. There, the plaintiffs brought claims subject to a ten-year statute of limitations under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA") based on events that had transpired more than ten years earlier. Plaintiffs argued that the claims were timely because it had been less than ten years since Congress had created a statutory cause of action and, therefore, less than ten years since the point in time they were first able to file suit. Id. at 141. The Court rejected this argument, reading Supreme Court precedent to mean that a cause of action arises once the final factual prerequisite to suit is met and finding that the final factual prerequisite to suit was the underlying terrorist attack itself, rather than the statutory right to sue. Id. The Court based its analysis largely on two conclusions specific to the FSIA. First, absent clear indication from Congress, the Court should not presume an intent to create a decades-old claim when creating a new cause of action. Id. at 141–42. Second, plaintiffs' reading would have rendered other provisions of the statute superfluous. Id. at 142. Neither consideration applies here. As explained, in the context of suits like CREW's, the "final factual prerequisite" is the exhaustion of mandatory administrative processes.

> To hold that the six-year time period runs from the completion of the contract, as the Government insists, would have unfortunate impact. The contractor is compelled to resort to administrative proceedings which may be protracted and which may last not only beyond the completion of the contract but continue for more than six years thereafter. If the time bar starts running from the completion date, the contractor could thus be barred from the courts by the time his administrative appeal is finally decided.

Crown Coat Front Co. v. United States, 386 U.S. 503, 514 (1967).

Citing this reasoning, the D.C. Circuit has found it "virtually axiomatic" that "a statute of limitations cannot begin to run against a plaintiff *before* the plaintiff can maintain a suit in court" and thus "a cause of action does not 'first accrue' . . . until a party has exhausted all administrative remedies whose exhaustion is a prerequisite to suit." Spannaus, 824 F.2d at 56–57 & n.3; see also Ortiz v. Sec'y of Defense, 41 F.3d 738, 743 (D.C. Cir. 1994) (describing as "unassailable" the "logic" that "a statute of limitations will not normally begin to run until a party has acquired the right to initiate the proceeding covered by the limitations period" by exhausting administrative remedies)  The same principle obtains here.  Running the statute of limitations before CREW was able to initiate the suit would render CREW unable to bring its claims—through no fault of its own—even though it otherwise had a right to do so.  Absent some express indication to the contrary, the Court will not assume that Congress designed the statute of limitations to yield that perverse result.  See Bay Area Laundry, 522 U.S. at 201.  The fact that FECA's citizen suit provision apparently exists to deal with agency intransigence in the face of a court order would make it particularly bizarre to prevent CREW from seeking relief.

The overall statutory scheme confirms the implausibility of a congressional desire to start the statute-of-limitations clock before an administrative complainant could sue.  For a plaintiff to sue an alleged FECA violator directly, it must first file an administrative complaint, prompting an initial recommendation from the FEC's Office of General Counsel and a dismissal vote from

the Commission.  See 52 U.S.C. § 30109(a)(8)(C).  Then, upon dismissal, the plaintiff must file

suit in a district court and await a favorable decision.  See id.  Congress surely knew that this

process could take time, as this case plainly shows.  Here, the FEC dismissed CREW's

complaint; the Court remanded the matter after concluding that the agency had acted contrary to

law; the FEC again dismissed the complaint; and the Court concluded that it had erred again.

The agency failed to act, permitting CREW to sue directly.  But had the complaint been

dismissed again based on yet another round of erroneous legal conclusions, the saga would have

continued.  Congress surely did not intend, in this statutory structure, to start a countdown before

a complainant had any right to file a citizen suit.

Nor does AAN's emphasis on 52 U.S.C. § 30109(a)(8)(A) change the calculus.  That

provision permits an administrative complainant to sue the FEC if it fails to act within 120 days

of the complaint being filed.  AAN suggests that CREW could have invoked this provision to

speed up the process.  As an initial matter, it is not clear that a court would order the FEC to act

immediately after the 120-day time period elapsed.  See, e.g., FEC v. Rose, 806 F.2d 1081, 1092

(D.C. Cir. 1986) (rejecting the argument that the FEC was required to act within 120 days).  And

even if CREW had sued under that provision and a court had ordered the FEC to act, that would

not necessarily have avoided the dismissal-remand-dismissal-remand pattern in this case.  There

would be no guarantee that the FEC, if ordered to act, wouldn't act contrary to law in dismissing

the complaint, further prolonging the process.

Moreover, AAN provides no authority to suggest that a plaintiff *must* speed along a

mandatory exhaustion regime if it wants to bring suit; to the contrary, as discussed above, courts

have consistently held that claims do not accrue until the plaintiff exhausts administrative

requirements and is able to sue.  To the extent that AAN presents this as a policy consideration

supporting a more stringent rule, it is unconvincing. Forcing administrative complainants to sue

the FEC to accelerate action would undermine Congress's goal of having the agency consider

these complaints in the first instance. While some complainants might sue once the 120 days is

up, others might choose to wait to see how the agency acts. Cf. Scott v. Johanns, 409 F.3d 466,

471 (D.C. Cir. 2005) ("[E]mployees also have incentives not to [sue while Title VII claims are in

administrative review]: the administrative process could produce a final disposition acceptable to

the employee, or if not, it could yield valuable evidence the employee could use in a later

lawsuit."). It serves neither congressional design nor the interests of complainants, the agency,

or subjects of complaints to force suits. Nor does it promote judicial economy. All the more

reason to conclude that, even if § 2462 applies, CREW complied with its statute of limitations.

    E. <u>Constitutional Claims</u>

    AAN next presents several constitutional challenges to FECA's citizen-suit provision.

    First, AAN argues that § 30109(a)(8)(C) violates the Take Care Clause of Article II of the

Constitution, which vests executive power in the President to "take Care that the laws be

faithfully executed." U.S. Const. art. II, § 3. In particular, AAN submits that § 30109(a)(8)(C)

infringes the Executive's prosecutorial discretion, authority protected by the Take Care Clause,

by giving private citizens a right to sue after the FEC has dismissed a complaint. AAN supports

this argument with then-Judge Kavanaugh's twin observations in <u>In re Aiken County</u> that

"Congress may not mandate that the President prosecute a certain kind of offense or offender"

and "the President may decline to follow a law the purports to require the Executive Branch to

prosecute certain offenses or offenders." 725 F.3d 255, 263, 266 n.11 (D.C. Cir. 2013)

(emphasis omitted). But § 30109(a)(8)(C) does not "mandate" or "require" the FEC to prosecute

anyone. It only says that a private citizen may file suit if the FEC fails to conform with a court

order finding a dismissal of an administrative complaint "contrary to law" based on an erroneous interpretation of FECA. As discussed at length above, the D.C. Circuit in CHGO blessed judicial review of such dismissals. 892 F.3d at 441 n.11. "Contrary to law" dismissals simply do not implicate prosecutorial discretion.

If AAN means to suggest that disregarding a court order falls within the FEC's prosecutorial discretion, that argument too is a non-starter. "[A]lthough prosecutorial discretion is broad, it is not unfettered." Wayte v. United States, 470 U.S. 598, 608 (1985) (internal quotation marks omitted). As now-Justice Kavanaugh went on to explain in Aiken County, "prosecutorial discretion encompasses the discretion not to enforce a law against private parties; it does not encompass the discretion not to follow a law imposing a mandate or prohibition on the Executive Branch." 725 F.3d at 266. Just as prosecutorial discretion does not grant the Executive Branch authority to refuse to follow a statutory mandate, it does not allow the Executive to disobey a court order finding an agency's reasons for dismissal "contrary to law." See 52 U.S.C. § 30109(a)(8)(C).

Second, AAN contends that § 30109(a)(8)(C) violates Article II's Appointments Clause,[10] by allowing private parties—as opposed to "Officers of the United States"—to "conduct[] civil litigation in the courts of the United States for vindicating public rights." Buckley, 424 U.S. at 140. This argument founders because Article III's standing requirements ensure that citizens suing under § 30109(a)(8)(C) do not "conduct[] civil litigation . . . for vindicating public rights." Id. So long as the plaintiff alleges an individualized injury (which it

_____

[10] The Appointments Clause states in relevant part that the President "shall nominate and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law; but the Congress may by law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

must in order to have standing), it is not just suing to vindicate public rights.  See U.S. House of Rep. v. U.S. Dep't of Commerce, 11 F. Supp. 2d 76, 96 (D.D.C. 1998) (holding that where a party "is pursuing legal process on its own behalf to prevent a legally cognizable injury to itself," it "is not endeavoring to 'take care that the laws be faithfully executed' or vindicate a general public interest in the proper administration of law"); see also Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 129 (1998) (O'Connor, J., concurring) (explaining that it "is hard to see . . . how [an environmental statute's] citizen-suit provision impinges on the power of the Executive" where the private litigant had standing to sue and its suit was not merely based upon "undifferentiated public interest" (internal quotation marks omitted)); Arpaio v. Obama, 797 F.3d 11, 31 (D.C. Cir. 2015) (Brown, J., concurring) ("By prohibiting abstract, general claims, the [standing] doctrine aims to ensure that the President's 'most important constitutional duty, to "take Care that the Laws be faithfully executed"' is not transferred to the courts.").  Accordingly, § 30109(a)(8)(C) does not violate Article II because in every case in which it is available, the citizen with standing to invoke the provision does so "in its own name to remedy a violation of federal law that has caused it injury."  Opposition at 38; see also 52 U.S.C. § 30109(a)(8)(C) (authorizing an administrative complainant to bring suit "in the name of such complainant").

But there is a more fundamental problem with AAN's argument.  "Enforcement by private attorneys general has become a feature of many modern legislative programs."  Spann v. Colonial Vill., Inc., 899 F.2d 24, 30 (D.C. Cir. 1990).  For example, in the Fair Housing Act, "Congress specifically left in the hands of private attorneys general" the authority to vindicate the "values endorsed by Congress in the Fair Housing Act," even though "the Attorney General and the Department of Housing and Urban Development may [also] enforce the Act."  Id. at 30; see also id. at 31 ("Plaintiffs are private actors suing other private actors, traditional grist for the

judicial mill.").  Similarly, both the Clayton Act and the Racketeer Influenced and Corrupt

Organizations Act "share a common congressional objective of encouraging civil litigation to

supplement Government efforts to deter and penalize the respectively prohibited practices."

Rotella v. Wood, 528 U.S. 549, 557 (2000).  So, too, in environmental litigation, where private

litigants often sue to enforce environmental statutes that are also enforced by the Environmental

Protection Agency.  See Me. People's All. v. Mallinckrodt, Inc., 471 F.3d 277, 292 (1st Cir.

2006) ("[A]llowing citizen suits to proceed is not the functional equivalent of allowing courts to

hijack EPA's regulatory authority and weave safety standards out of whole cloth.").  And, of

course, in *qui tam* litigation under the False Claims Act private litigants may sue alleged

statutory violators directly.  See, e.g., United States ex rel. Springfield Terminal Ry. Co. v.

Quinn, 14 F.3d 645, 649 (D.C. Cir. 1994).  Thus, if AAN's argument proves anything, it proves

too much.   If § 30109(a)(8)(C) violates the Appointments Clause because it allows a private

litigant to sue an alleged statutory violator directly, then long-established housing,

environmental, antitrust, and *qui tam* statutes also violate Article II.  That simply cannot be right.

Third, AAN argues that enforcing FECA here would violate due process because when

AAN ran the challenged advertisements, which are protected by the First Amendment, it did not

have fair notice that FECA would consider "electioneering communications as indicative of a

major purpose to nominate or elect candidates."  MTD at 34.

Due Process requires that a potential actor have "fair warning of the nature of the

proscribed conduct."  Rowan v. U.S. Post Office Dep't, 397 U.S. 728, 740 (1970).  "Deprivation

of the right to fair warning . . . can result both from vague statutory language and from an

unforeseeable and retroactive judicial expansion of statutory language that appears narrow and

precise on its face."  Rogers v. Tennessee, 532 U.S. 451, 457 (2001).  "The precision required by

due process varies, of course, with the nature of the enactment." DiCola v. Food & Drug Admin., 77 F.3d 504, 508 (D.C. Cir. 1996) (internal quotation marks omitted). Generally, courts have expressed "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498–99 (1982). However, if "the law interferes with the right of free speech or of association, a more stringent vagueness test" applies. Id.

That said, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." Holder v. Humanitarian Law Project, 561 U.S. 1, 19 (2010) (internal quotation marks omitted). As the D.C. Circuit has explained, "language is unavoidably inexact" and courts therefore "do not require that an enactment touching on First Amendment interests set forth the precise line dividing proscribed from permitted behavior, or that a person contemplating a course of behavior know with certainty whether his or her act will be found to violate the proscription." United States v. Thomas, 864 F.2d 188, 195 (D.C. Cir. 1988). Moreover, "no more than a reasonable degree of certainty can be demanded and it is not unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." Throckmorton v. Nat'l Transp. Safety Bd., 963 F.2d 441, 444–45 (D.C. Cir. 1992) (internal quotation marks omitted).

In evaluating AAN's due process challenge, the Court must first consider "any limiting construction" that has been proffered. Vill. of Hoffman Estates, 455 U.S. at 494 n.5. As discussed above, in Buckley, the Supreme Court narrowly construed the definition of "political committee" under FECA. 424 U.S. at 79. Buckley noted that FECA's definition of "political committee" could be construed as reaching large amounts of issue advocacy, a construction which would impermissibly burden speech. Id. Seeking to avoid this unconstitutional result,

Buckley narrowed the construction of "political committees" to "only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." Id. The Supreme Court clarified the meaning of Buckley's "major purpose test" in MCFL, 479 U.S. at 262, holding that an organization's "major purpose" could be determined by looking at its actions and that significant spending on campaign activity could indicate that the organization was a political committee. And in 2002, Congress passed BCRA with the intent of bringing electioneering communications within the ambit of FECA's disclosure requirements. 52 U.S.C. § 30104(f)(3)(A)(i); see McConnell, 540 U.S. at 126–32 (controlling opinion of Stevens & O'Connor, J.J.). As the Supreme Court explained, "the vast majority" of "issue ads broadcast during the 30– and 60–day periods preceding federal primary and general elections are the functional equivalent of express advocacy" and FECA's disclosure rules "apply in full . . . to the entire range of 'electioneering communications.'" Id.

With the narrowing gloss provided by the Supreme Court and Congress's subsequent enactment of BCRA, the Court is well satisfied that AAN had fair notice that FECA considers "electioneering communications as indicative of a major purpose to nominate or elect candidates." MTD at 34. As the Court thoroughly explained in CREW II, the conclusion that electioneering communications are presumptively indicative (although not determinative) of an organization's major purpose is consistent with Buckley, subsequent Supreme Court cases, and the text and legislative history of FECA and BCRA. CREW II, 299 F. Supp. 3d at 96. Therefore, this is not a case in which the court has applied "unforeseeable and retroactive judicial expansion of statutory language that appears narrow and precise on its face." Rogers, 532 U.S. at 457. Moreover, although the Constitution is most demanding of criminal statutes that infringe First Amendment freedoms, even there Due Process requires only "reasonable specificity to

provide fair notice," and not "that a person contemplating a course of behavior know with certainty whether his or her act will be found to violate the proscription." Thomas, 864 F.2d at 195. Such notice is easily found here.

Resisting this conclusion, AAN argues that it reasonably relied upon past statements by a minority of FEC Commissioners and by the FEC's Office of General Counsel. This argument fails for several reasons. First, AAN was not entitled to rely upon the statements of the minority of the Commissioners or the statements of the Office of General Counsel because such statements are "not law" and provide no "binding legal precedent or authority." Common Cause v. FEC, 842 F.2d 436, 449 n.32, 450 (D.C. Cir. 1988). Second, to the extent that such statements endorsed the view that the FEC may not consider electioneering communications in determining an organization's major purpose, that position is contrary to law. CREW II, 299 F. Supp. at 101. Lastly, even in Thomas, where the defendants faced criminal sanctions for expressive conduct and had received "less than edifying responses" from the Department of the Interior about whether that conduct was covered by the criminal statute, the Circuit nonetheless held that the regulation "was not unconstitutionally vague as applied to them." 864 F.2d at 196. Accordingly, the Court holds that AAN had fair notice that electioneering communications are "presumptively . . . election related," CREW II, 299 F. Supp. 3d at 93, and could be considered in assessing AAN's major purpose under FECA.

F.   Foreclosed by FECA

Finally, AAN contends that CREW's claims are foreclosed by FECA for many of the same reasons offered by the controlling Commissioners in their statements of reasons in CREW I and CREW II. The Court confronted these arguments in its prior opinions and need not repeat its analysis here. To the extent AAN that seeks to elevate certain factors over others in applying

<u>Buckley</u>'s "major purpose" test, it will have ample opportunity to do so at the merits stage of the case.[11]

### IV. Conclusion

For the foregoing reasons, the Court will grant AAN's Motion to Dismiss CREW's claims to the extent they seek a declaration of liability based on conduct by AAN after the period covered by CREW's original administrative complaint. It will deny the motion in all other respects. A separate Order shall accompany this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>September 30, 2019</u>

---

[11] AAN also asks the Court to strike CREW's demand for attorney's fees given the absence of any fee-shifting provision in FECA. The Court agrees with AAN that fees typically are not awarded in federal litigation without specific congressional authorization. That is especially so in cases, like this one, that present issues of first impression. Still, the Court declines to strike CREW's request at this juncture because the issue of fees is not ripe (and may never be) and the parties have not briefed other potential sources of fee-shifting authority.